Receipt # 333 89243

n/c to atty
Sm. issued w/ n/c

Judge Kane
HBG

FILED
SCRANTON

AUG 2 0 2002

PER _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNSYLVANIA PROTECTION & ADVOCACY, INC., | § § § | 1: CV 02-1460 |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. |
| ROBERT S. ZIMMERMAN, JR., in his official capacity as Secretary of the Department of Health of the Commonwealth of Pennsylvania, | § § § § § § | |
| Defendant. | § | |

**COMPLAINT**

**I. Introduction**

1. Plaintiff Pennsylvania Protection & Advocacy, Inc. ("PP&A") brings this action to challenge the refusal of defendant to provide documents relating to the deaths of three Pennsylvania nursing home residents with disabilities: Mabel Taylor, Esther Hopkins, and Russell Blystone.

At the time of Ms. Taylor's death, she was an individual with disabilities residing at Atrium I, a nursing home in Pittsburgh. At the time of Ms. Hopkins' death, she was an individual with disabilities residing at The Wilkins House, a nursing home in Wilkinsburg. At the time of Mr. Blystone's death, he was an individual with disabilities residing at The Wightman Center for Nursing and Rehabilitation ("The Wightman Center"), a nursing home in Pittsburgh.

2. Pursuant to the Protection and Advocacy for Individual Rights ("PAIR") Act, 29 U.S.C. § 794e (f)(2), PP&A is entitled to review and obtain copies of records of individuals with disabilities in instances of abuse, neglect, or death.

3. PP&A, through its employees and its counsel, has requested in writing that defendant provide the records of its investigations into the deaths of Ms. Taylor, Ms. Hopkins, and Mr. Blystone, but defendant has refused to provide them.

4. Defendant's refusal to provide the requested records to PP&A violates the PAIR Act.

## II. Jurisdiction and Venue

5. This action is authorized by 42 U.S.C. § 1983, 28 U.S.C. §§ 2201-02, and 29 U.S.C. § 794e. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

6. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b). The defendant resides in this district and the events and omissions complained of occurred in this district.

### III. Parties

7. PP&A is a non-profit Pennsylvania corporation that has been designated by the Commonwealth of Pennsylvania to protect and advocate on behalf of people with disabilities pursuant to, *inter alia*, the PAIR Act, 29 U.S.C. § 794e *et. seq.*

8. PP&A spends considerable time and resources monitoring conditions at state institutions and other facilities, including nursing homes such as Atrium I, The Wilkins House, and The Wightman Center, and in advocating for the rights of the individuals residing in those facilities.

9. Defendant Robert S. Zimmerman, Jr., is the Secretary of the Department of Health ("DOH") of the Commonwealth of Pennsylvania. The Department of Health has responsibility for quality of care oversight for nursing facilities in the Commonwealth such as Atrium I, The Wilkins House, and The Wightman Center. DOH's obligations include: licensing facilities; verifying their compliance with state and federal health and safety standards by conducting regular on-site surveys to assure health, safety, sanitation, fire, and quality of care requirements; identifying deficiencies which may affect state licensure or eligibility for federal

reimbursements under the Medicaid and Medicare programs; and conducting complaint investigations concerning Pennsylvania nursing facilities.

### IV. Facts

10. PP&A staff became aware of Mrs. Taylor's death at Atrium I nursing home by viewing a local television news report on the KDKA network in early November, 2001. Subsequently, PP&A staff telephoned the Pittsburgh regional office of DOH to request the records of its investigation into that facility. DOH staff did not comply with the request, instead referring PP&A staff to the Harrisburg DOH office.

11. The nursing home residents' deaths were also covered Pittsburgh Post-Gazette newspaper on various occasions. According to a February 3, 2002, article, on October 26, 2001, Mabel Taylor, a resident of Atrium I nursing home, died from exposure in an outside courtyard of that facility after a door locked behind her late at night. Mrs. Taylor was an individual with Alzheimer's disease and dementia.

12. The February 3, 2002, Post-Gazette article stated that Atrium I staff had found Ms. Taylor's body in the facility's courtyard at 4:30 a.m. on October 26, 2001. The article claimed that although the door through which Ms. Taylor walked was equipped with an alarm, the alarm did not ring, because, as facility workers

4

conceded to investigators, employees often propped doors open to deactivate alarms while they went outside to smoke cigarettes.

The February article further stated that this practice was against both nursing home policy and state safety requirements.

13. According to the February 3, 2002, Post-Gazette article, Mrs. Taylor's daughter was contacted by an Atrium I employee the morning after her mother's death and told that her mother had died "peacefully in bed." The article stated that when the daughter arrived at the facility, she and her husband " . . . were puzzled to find Taylor's "still-icy body in a room where the heat had been turned up stiflingly high."

14. The February 3, 2002, article stated that an Atrium I aide named Rose Beasley then informed Mrs. Taylor's daughter where her mother really had died. The article stated that police and the coroner were then summoned and that an inquest was convened in December, 2001. The February article further stated that "[t]estimony during the inquest indicated that Atrium employees disobeyed nursing-home policy by moving [Ms. Taylor's] body indoors without notifying the coroner's office."

15. A subsequent Post-Gazette article dated March 6, 2002, stated that Atrium I had been fined $5,500 by the state DOH for its deficient procedures and handling of Ms. Taylor's death.

The March article also stated that Atrium had been cited for 99 deficiencies in the 30 months prior, which, according to DOH, was more than 4 times as many citations as the average among facilities its size.

16. On November 7, 2001, PP&A wrote to Sue Getgen, the director of the Pennsylvania DOH Division of Nursing Care Facilities, to request the following records concerning Ms. Taylor's death: a copy of the DOH investigation report when completed; a copy of the incident report; an update of the status of the investigation; a list of any other agencies involved in the investigation; and Plans of Correction ("2567 forms") issued by DOH between December 17, 2000 - July 12, 2001. Attached to the request was a list of the specific violations and dates by code number for DOH's reference.

17. PP&A received a response from DOH counsel on March 25, 2002. The 2567 forms were enclosed; however, DOH did not provide any of the remaining requested documents. Instead, DOH requested that PP&A provide a "specific legal basis upon which [it is] entitled to receive non-public information."

18. On April 29, 2002, counsel for PP&A responded in writing to DOH counsel, providing PP&A's legal basis for obtaining the requested records and requesting that DOH provide those documents immediately to PP&A.

19. DOH has not provided the requested records to PP&A as of the date of this Complaint.

20. According to the March 6, 2002, Post-Gazette article referenced above, Esther Hopkins, a former resident of The Wilkins House, died at the University of Pittsburgh Medical Center ("UPMC") Braddock on December 1, 2001, from "asphyxiation due to compression of the neck" due to an incident at The Wilkins House. The March article stated that Mrs. Hopkins had been restrained in her wheelchair with a waist belt and slid under the belt to the floor, causing the belt to compress her upper chest and cut off her breathing.

21. The March article revealed that state inspectors had noted Hopkins "had a history of sliding in [her] chair and the staff were aware that the restraint posed a potential for an unsafe environment for this resident." The article added that "therapists at Wilkins House had recommended that Hopkins instead use a wheeled walker with supervision in moving about."

22. The March article also mentioned that DOH inspectors described a "pattern at Wilkins House of using restraints without proper evaluation of

7

residents" and that a fine of $9,450.00 had been imposed on the facility and its license downgraded to a 6-month provisional one as a result of this incident. According to the Post-Gazette article, a provisional license allows DOH inspectors to more closely monitor a facility.

23. The March Post-Gazette article also stated that Russell Blystone, a former resident of The Wightman Center, had died on December 30, 2001, from choking on food. The article cited a DOH report which said that Mr. Blystone had a tracheostomy, which prevented him from swallowing food safely and he was to receive nourishment by feeding tube only. The article stated that Mr. Blystone's breathing stopped when food he ate by mouth lodged in his tracheostomy tube. The article further stated that the food had come from a breakfast tray given to Mr. Blystone by mistake.

24. The March article stated that DOH had fined The Wightman Center $3,500.00 for the "circumstances of Blystone's death." The article also mentioned that the facility's license had been downgraded the previous December to a provisional license. The article stated that among the 69 nursing homes in Allegheny County, Atrium I, Wilkins House, and The Wightman Center were the only ones currently carrying provisional licenses.

25. On May 9, 2002, PP&A sent another letter to Sue Getgen of DOH requesting documents concerning DOH's investigation of the deaths of Mrs. Hopkins and Mr. Blystone. DOH has not responded to this letter as of the date of this Complaint nor has it provided the requested records to PP&A.

26. Both written and oral requests from PP&A and its counsel have been made to defendant for access to and copies of all documents concerning the investigations into the deaths of Mabel Taylor, Esther Hopkins, and Russell Blystone. However, defendants refuse to provide these documents, which are essential to PP&A's statutorily authorized investigation.

27. The documents in question, copies of which the defendants refuse to provide to PP&A, include but are not limited to:

> (i) investigations and reports of the care of Mabel Taylor, Esther Hopkins, and Russell Blystone leading up to their deaths;
> (ii) the investigations into the circumstances of the deaths of Mabel Taylor, Esther Hopkins, and Russell Blystone, and whether negligence was a factor in their deaths.

28. As a condition and consequence of the Commonwealth of Pennsylvania receiving federal funds under the PAIR Act, 29 U.S.C. §§ 794e, it is required to "have in effect a system to protect and advocate the rights of individuals with disabilities[.]" 29 U.S.C. §794e (f)(1). PP&A has been designated by Commonwealth officials to be that system.

9

29. PP&A, as the "eligible system" in Pennsylvania, "[has] the same general authorities, including access to records . . . as are set forth in part C of the Developmental Disabilities Assistance and Bill of Rights Act [DD Act.]" 29 U.S.C. § 794e (f)(2), *citing* 42 U.S.C. §15043(J).

30. "Records" is defined under the DD Act:

"Record" includes –

    (1) a report prepared or received by any staff at any location at which services, supports or other assistance is provided to individuals with developmental disabilities;
    (2) a report prepared by an agency or staff person charged with investigating reports of incidents of abuse or neglect, injury or death occurring at such location, that describes such incidents and the steps taken to investigate such incidents . . 42 U.S.C. §15043 (c).

31. The DD Act requires that systems like PP&A "have immediate access, not later than 24 hours after the system makes such a request, to the records without consent from another party, in a situation in which services, supports, and other assistance are provided to an individual with a developmental disability . . . in any case of **death**[.]" 42 U.S.C. § 15043 (a)(2)(J)(ii)(II) [emphasis added].

32. Defendant's refusal to provide PP&A with all the requested documents in this matter prevents PP&A from fully performing its statutory duty to investigate incidents of suspected abuse, neglect, injury, or death.

33. Plaintiff has no adequate remedy at law.

## V. Claims

34. Defendant's actions and inactions in refusing to provide PP&A with all the records it has requested relating to the deaths of Mabel Taylor, Esther Hopkins, and Russell Blystone violate PP&A's statutory rights under the PAIR Act, 29 U.S.C. § 794e *et. seq.* and 42 U.S.C. § 1983.

## VI. Prayer for Relief

35. WHEREFORE, plaintiff requests:

   (a) that the Court exercise jurisdiction over this action;

   (b) that the Court declare that defendant's actions and inactions violate the PAIR Act and 42 U.S.C. § 1983;

   (c) that the Court order defendant to provide to PP&A all reports, documents, and records relating to the care, treatment, and deaths of Mabel Taylor, Esther Hopkins, and Russell Blystone; and

   (d) that the Court issue such other relief as may be just, equitable, and appropriate, including an award of Plaintiff's reasonable attorneys' fees and expenses under 42 U.S.C. § 1988.

Dated: August 16, 2002									Respectfully submitted,

*/s/ Jana H. Finder*
Jana H. Finder
Pa. I.D. No. 79608
Disabilities Law Project
1901 Law & Finance Building
429 Fourth Avenue
Pittsburgh, PA 15219
Tel. (412) 391-5225
Fax: (412) 391-4496

Counsel for Plaintiff PP&A